

**ORDERED in the Southern District of Florida on July 27, 2017.**



**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re:

**ROLLAGUARD SECURITY, LLC,**          Case No. 14-38071-EPK
**SHAMROCK JEWELERS, INC., and**    **(Substantively Consolidated)**
**SHAMROCK JEWELERS LOAN**
**& GUARANTEE, LLC,**                **Chapter 7**

      Debtors.

_____/

**ROBERT C. FURR not individually but**
**as Chapter 7 Trustee of the estate of the**
**Debtors, Rollaguard Security, LLC, et al.**

      Plaintiff,

v.                                   Adv. Proc. No. 16-01755-EPK

**TD BANK, N.A.,**

      Defendant.

_____/

**ROBERT C. FURR not individually but**
**as Chapter 7 Trustee of the estate of the**
**Debtors, Rollaguard Security, LLC, et al.**

      Plaintiff,

v.                                                          Adv. Proc. No. 16-01756-EPK

PNC BANK, N.A.,

      **Defendant.**

_____/

**ROBERT C. FURR not individually but
as Chapter 7 Trustee of the estate of the
Debtors, Rollaguard Security, LLC, et al.**

      **Plaintiff,**

v.                                                          Adv. Proc. No. 16-01757-EPK

**JPMORGAN CHASE BANK, N.A.
d/b/a CHASE BANK,**

      **Defendant.**

_____/

## CONSOLIDATED ORDER GRANTING MOTIONS TO DISMISS

In the above-captioned adversary proceedings, Robert C. Furr, as chapter 7 trustee (the "Trustee") of the bankruptcy estates of Rollaguard Security, LLC ("Rollaguard") and the substantively consolidated debtors, Shamrock Jewelers, Inc. and Shamrock Jewelers Loan & Guarantee, LLC (together, the "Shamrock Entities" and, with Rollaguard, the "Debtors"), sues TD Bank, N.A. ("TD Bank") (Adv. Proc. No. 16-01755-EPK), PNC Bank, N.A. ("PNC Bank") (Adv. Proc. No. 16-01756-EPK), and JPMorgan Chase Bank, N.A. d/b/a Chase Bank ("JPMC Bank") (Adv. Proc. No. 16-01757-EPK) (collectively, the "Defendants") to avoid and recover alleged fraudulent transfers made by the Debtors to the Defendants and to recover monetary damages for the Defendants' alleged aiding and abetting of conversions and negligence (the "Complaints"). Each of the Complaints in these adversary proceedings allege the same facts, except where noted below, and present the same five requests for relief.[1]  In

---

[1] *See* ECF No. 1, Adv. Proc. No. 16-01755-EPK; ECF No. 1, Adv. Proc. No. 16-01756-EPK; and ECF No. 1, Adv. Proc. No. 16-01757-EPK.

response, TD Bank filed the *Defendant's Motion to Dismiss the Complaint and Memorandum of Law in Support* [ECF No. 26, Adv. Proc. No. 16-01755-EPK], PNC Bank filed *PNC Bank, National Association's Amended Motion to Dismiss the Trustee's Complaint for Failure to State a Claim Upon Which Relief Can Be Granted* [ECF No. 26, Adv. Proc. No. 16-01756-EPK], and JPMC Bank filed *JP Morgan Chase Bank, N.A.'s Motion to Dismiss Adversary Complaint to Avoid and to Recover Avoidable Transfers, for Aiding and Abetting Conversion and for Other Relief* [ECF No. 21, Adv. Proc. No. 16-01757-EPK] (collectively, the Motions to Dismiss").

In the Motions to Dismiss, the Defendants raise substantially similar arguments in opposition to the Complaints. Indeed, in each of the Motions to Dismiss, the Defendants indicate that they join in the arguments raised by the other Defendants. Having considered the Complaints, the Motions to Dismiss, and the responses and replies filed in connection therewith [ECF Nos. 38 and 39, Adv. Proc. No. 16-01755-EPK; ECF Nos. 42 and 43, Adv. Proc. No. 16-01756-EPK; and ECF Nos. 30 and 31, Adv. Proc. No. 16-01757-EPK], the Court finds it appropriate to issue this consolidated order addressing all of the Motions to Dismiss.

For the reasons discussed in more detail below, the Court grants the Defendants' Motions to Dismiss and dismisses, with prejudice, the Trustee's Complaints.

## BACKGROUND

In counts I and II of the Complaints, the Trustee sues the Defendants to avoid alleged fraudulent transfers made by the Debtors to the Defendants under the actual and constructive fraud provisions of section[2] 548(a)(1)(A)-(B) and under the actual and constructive fraud provisions of section 544 incorporating Florida Statutes § 726.105(1)(a)-(b), and to recover the alleged fraudulent transfers from the Defendants pursuant to section

---

[2] Unless otherwise noted, the word section or sections refers to the stated section or sections of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

550.  In counts III, IV, and V of the Complaints, the Trustee sues the Defendants for monetary damages for the Defendants' alleged aiding and abetting of conversions and for their alleged negligence.

Because these are motions to dismiss, the Court accepts as true the allegations in the Complaints [ECF No. 1, Adv. Proc. No. 16-01755-EPK; ECF No. 1, Adv. Proc. No. 16-01756-EPK; and ECF No. 1, Adv. Proc. No. 16-01757-EPK].  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

At all times relevant to the claims presented here, Anthony T. Simpson was the Managing Member of Rollaguard and David Tabony was the Chief Financial Officer and Vice President of Rollaguard.  Mr. Tabony caused Rollaguard to file the chapter 7 petition commencing this case on December 30, 2014.  Mr. Simpson was the President of Shamrock Jewelers, Inc. and his spouse, Debra Simpson, was the Vice President of Shamrock Jewelers, Inc.  Mr. Simpson was the sole member of Shamrock Jewelers Loan & Guarantee, LLC.

Rollaguard represented itself as a manufacturer of traceable security cases used to transport valuable items, such as jewelry, and sensitive documents.  Rollaguard, at the direction of Mr. Simpson, engaged investors and raised substantial capital in order to finance the manufacture, marketing, and sale of security cases.[3]  However, at the time Rollaguard filed its chapter 7 petition, Rollaguard was not engaged in a viable business venture.  Indeed, it appears Rollaguard never manufactured a single security case.

The Shamrock Entities operated a jewelry store in Florida from approximately 1965 to 2015, purporting to sell, purchase, and repair jewelry.  The Shamrock Entities also claimed to operate a pawn brokerage business, consisting of a series of pawn-loan transactions where the Shamrock Entities would provide short-term, high interest loans to customers in

---

[3] Rollaguard's schedules reflect that it received capital investments exceeding $12 million.  Schedule F, ECF No. 24, Case No. 14-38071-EPK.

exchange for jewelry.  The Shamrock Entities, at the direction of Mr. Simpson, engaged investors and raised capital in order to finance the purported pawn brokerage business. However, the Shamrock Entities did not in fact engage in any pawn brokerage.

The financial affairs of Rollaguard and the Shamrock Entities were substantially intertwined.  Capital investments raised by Mr. Simpson on behalf of Rollaguard were routinely used by the Shamrock Entities.  While the Shamrock Entities engaged in some legitimate business, in particular the operation of the long-standing jewelry store, they retained only a modest inventory, small in comparison to the amount of capital they received from Rollaguard.  On top of this, the Shamrock Entities failed to maintain adequate books and records.

Mr. Simpson manipulated Rollaguard and the Shamrock Entities to defraud investors and siphon funds for himself.  Prior to filing these adversary proceedings against the Defendants, the Trustee obtained, among other relief, a final default judgment of $2,208,407.60 against Mr. Simpson and his spouse for pre-petition transfers from Rollaguard. ECF No. 70, Adv. Proc. No. 15-01311-EPK.  It appears that Mr. Tabony and Ms. Simpson were each without knowledge of any wrongdoing by Mr. Simpson.

The Debtors maintained four bank accounts at TD Bank from December 2010 through November 2013, three bank accounts at PNC Bank from December 2010 through November 2013, and three bank accounts at JPMC Bank from July 2014 through March 2015.  During the four-year period before the commencement of this chapter 7 case, the Debtors deposited monies into and withdrew monies from the various bank accounts maintained at TD Bank, PNC Bank, and JPMC Bank.[4]  The Debtors also freely transferred monies between the

---

[4] According to the Complaints: (1) during the banking relationship between the Debtors and TD Bank, the Debtors deposited no less than $24,495,965.00 and withdrew no less than $24,498,880.00; (2) during the banking relationship between the Debtors and PNC Bank, the Debtors deposited no less than $9,853,183.82 and withdrew

various accounts maintained at TD Bank, PNC Bank, and JPMC Bank, but always within the respective banking institution.[5]

Each of the subject bank accounts was a typical demand deposit account.  There is nothing in the Complaints that would lead the Court to conclude that the Debtors ever gave up complete autonomy over the various accounts.  Indeed, the Complaints make it clear that the Debtors in fact exercised unfettered discretion with the various accounts, depositing and withdrawing funds, transferring funds, and making payments from the accounts, whenever, in whatever amounts, and however they liked.   From the facts alleged in the Complaints, when this bankruptcy case was filed the Debtors' accounts at TD Bank had, in the aggregate, a small overdraft, the Debtors' accounts at PNC Bank had, in the aggregate, a very small balance, and the Debtors' accounts at JPMC Bank had, in the aggregate, a small overdraft. On the date each Debtor became subject to this case, the Debtors had, in effect, no funds on deposit at TD Bank, PNC Bank, or JPMC Bank.  The Debtors had abandoned their banking relationships with TD Bank and PNC Bank more than a year prior to the filing of this case. The Shamrock Entities' use of accounts at JPMC Bank continued through March 2015, about six months prior to their substantive consolidation with Rollaguard in September 2015.  ECF No. 126; Case No. 14-38071-EPK.  In other words, the Debtors had used the various accounts for several years and then left them empty, in each case months before the relevant Debtor became part of this case.

The Trustee argues that the Debtors' regular deposits to the various bank accounts maintained at TD Bank, PNC Bank, and JPMC Bank constitute actual and/or constructive

---

no less than $9,852,488.75; and (3) during the banking relationship between the Debtors and JPMC Bank, the Debtors deposited no less than $4,368,395.29 and withdrew no less than $4,368,729.18.

[5] According to the Complaints: (1) the Debtors transferred no less than $3,278,342.00 among the accounts at TD Bank; (2) the Debtors transferred no less than $956,756.00 among the accounts at PNC Bank; and (3) the Debtors transferred no less than $100,092.00 among the accounts at JPMC Bank.

fraudulent transfers avoidable under section 548 or under section 544 incorporating Florida law. In other words, the Trustee argues that each time one of the Debtors deposited funds into one of its own unrestricted accounts at TD Bank, PNC Bank, or JPMC Bank, that deposit constituted a fraudulent transfer to the relevant Defendant that the Trustee may avoid under applicable law. The Trustee seeks a judgment avoiding each such transfer and a money judgment against each of the Defendants equal to the total deposits made by the Debtors to each of the Defendants during the relevant periods.

The Trustee argues that the Defendants had actual and/or constructive knowledge of Mr. Simpson's suspicious activity, that they rendered substantial assistance to Mr. Simpson by violating federal banking regulations, and that the Defendants are therefore liable for aiding and abetting Mr. Simpson's conversions of investor funds. The Trustee seeks a monetary judgment against each of the Defendants equal to the aggregate sum withdrawn from the Debtors' accounts at the subject Defendant.

In support of these claims, the Trustee maintains that the Defendants disregarded federal banking regulations by allowing Mr. Simpson to use the Debtors' bank accounts to siphon funds for himself at the expense of the Debtors' creditors. For example, the Trustee alleges that, during the respective banking relationships, the Defendants failed to respond properly when Mr. Simpson purchased cashier checks where the "remitter" was a different person or entity from the owner of the bank account. The Trustee alleges that TD Bank failed to respond properly to Mr. Simpson's purchasing of cashier checks using monies from multiple bank accounts, or by withdrawing monies from one bank account and consecutively depositing those monies in another account, in order to purchase cashier checks. The Trustee maintains that, under these circumstances, the Defendants improvidently sold cashier checks to Mr. Simpson at the expense of the Debtors' creditors. In this vein, the Trustee also points to the fact that the Defendants permitted Mr. Simpson to overdraft the Debtors' bank

accounts repeatedly during the four-year period prior to the commencement of this chapter 7 case.

The Trustee argues that these facts, accompanied by the deposits and withdrawals described above, put the Defendants on actual and/or constructive notice that Mr. Simpson was converting monies from the Debtors' bank accounts for an improper purpose or for his own personal use.  In support of the contention that TD Bank, in particular, had actual notice of Mr. Simpson's suspicious activities, the Trustee states that, on June 11, 2013, TD Bank froze two of the Shamrock Entities' bank accounts.  The Complaints against PNC Bank and JPMC Bank contain no specific factual allegations to support the contention that they had actual knowledge of Mr. Simpson's suspicious activities; those Complaints focus entirely on the "red flags" raised by the Defendants' alleged violations of federal banking regulations.

Finally, the Trustee argues that the Defendants were negligent in processing Mr. Simpson's withdrawals from the Debtors' bank accounts.  According to the Trustee, state and federal law, "including but not limited to Chapter 670 of the Florida Statutes," imposed a duty of care on the Defendants "to correctly, cautiously, and prudently process [the withdrawals] subject to commercially reasonable security procedures."  The Trustee alleges that the Defendants breached that duty by violating federal banking regulations and/or lacking good faith in processing the withdrawals due to their actual and/or constructive knowledge of Mr. Simpson's suspicious activities.  As a result, the Trustee alleges that the Defendants actually and proximately caused damage to the Debtors in the amounts withdrawn from the various bank accounts maintained at TD Bank, PNC Bank, and JPMC Bank.

## MOTION TO DISMISS STANDARD

In order to state a claim for relief under Fed. R. Bankr. P. 7008, incorporating Fed. R. Civ. P. 8(a), and thus survive a motion to dismiss under Fed. R. Bankr. P. 7012, incorporating

Fed. R. Civ. P. 12(b)(6), a plaintiff must include in his complaint "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*. (citing *Twombly*, 550 U.S. at 555-56). Further, "[a] pleading that offers 'labels and conclusions' or 'a formalistic recitation of the elements of a cause of action will not do.'" *Id*. (quoting *Twombly*, 550 U.S. at 555). If a plaintiff's allegations do "not nudge[] their claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When a plaintiff asserts claims based upon fraud or mistake, simply meeting the pleading requirements of Rule 8(a) is insufficient to survive a motion to dismiss under Fed. R. Bankr. P. 7012, incorporating Fed. R. Civ. P. 12(b)(6). In addition, Fed. R. Bankr. P. 7009, incorporating Fed. R. Civ. P. 9(b), requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Rule 9(b) "serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" *Durham v. Bus. Mgmt. Assoc.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985)). The Eleventh Circuit has held that:

> Rule 9(b) is satisfied if the complaint sets forth '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.'

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (quoting *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007)).  However, "Rule 9(b) does not require a plaintiff to allege specific facts related to the defendant's state of mind."  *Id.*  "[M]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Because counts I and II of the Complaints contain allegations of fraud, the Court applies the heightened pleading standard of Fed. R. Civ. P. 9(b) to the components of those counts addressing claims based in actual fraud.

"In construing allegations of actual fraud in an action brought by a bankruptcy trustee, the 'particularity' standard of . . . Rule 9(b) is somewhat relaxed." *Cox v. Grube (In re Grube)*, 500 B.R. 764, 776 (Bankr. C.D. Ill. 2013); *Mukamal v. BMO Harris Bank N.A. (In re Palm Beach Fin. Partners, L.P.)*, 488 B.R. 758, 766-67 (Bankr. S.D. Fla. 2013) (citing cases in support).  When a bankruptcy trustee brings a claim for fraud, Fed. R. Civ. P. 9(b)'s particularity requirement is met "'if the person charged with fraud will have a reasonable opportunity to answer the complaint and has adequate information to frame a response . . . or if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations.'" *Tolz v. United States (In re Brandon Overseas, Inc.)*, 2010 Bankr. LEXIS 2326, at *13, 2010 WL 2812944, at *5 (Bankr. S.D. Fla 2010) (quoting *Kapila v. Arnel (In re Arizen Homes)*, 2009 Bankr. LEXIS 344, at *9, 2009 WL 393863, at *2 (Bankr. S.D. Fla. 2009)).  "Such flexibility afforded to trustees in bankruptcy with respect to the pleading requirements is [usually] appropriate '[g]iven the inevitable lack of knowledge concerning the acts of fraud previously committed against the debtor, a third party.'" *In re Arizen Homes*, 2009 Bankr. LEXIS 344, at *6, 2009 WL 393863, at *2 (quoting *In re Sverica Acquisition Corp.*, 179 B.R. 457, 463 (Bankr. E.D. Pa. 1995)).  However, when a trustee does

not suffer from this lack of knowledge, the need to relax Fed. R. Civ. P. 9(b)'s heightened pleading requirements does not exist.  In such cases, the trustee will be held to the usual Fed. R. Civ. P. 9(b) standard.  *See Roberts v. Balasco (In re Ernie Haire Ford, Inc.)*, 459 B.R. 824, 837-38 (Bankr. M.D. Fla. 2011).

## COUNTS I AND II

The Court begins with the Trustee's fraudulent transfer claims.  The Trustee must show two things in order to recover the aggregate amount deposited into the various bank accounts maintained by the Debtors with the Defendants.  First, the Trustee must show that there was a fraudulent transfer under section 548 or under section 544 incorporating Florida Statutes § 726.105(1)(a)-(b).  Among other things, this requires the Trustee to show there was in fact a transfer within the meaning of section 101(54) and Florida law.  Second, the Trustee must show that each Defendant is a party from whom the Trustee may seek recovery under section 550.  "Section 550 allows a trustee to recover the amount fraudulently transferred from the initial transferee, the entity for whose benefit the transfer was made, or a subsequent transferee of the initial transferee."  *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1198 (11th Cir. 1988) (citing 11 U.S.C. § 544(a)).

Under the actual fraud provision of section 548, the Trustee "may avoid any transfer . . . of an interest of the debtor in property," made within two years before the filing of a bankruptcy petition, if the debtor made such transfer "with actual intent to hinder, delay, or defraud . . ." any existing or future creditor.  11 U.S.C. § 548(a)(1)(A).  Under the constructive fraud provision of section 548, the trustee "may avoid any transfer . . . of an interest of the debtor in property," made within two years before the filing of a bankruptcy petition, if the debtor "received less than a reasonably equivalent value in exchange for such transfer" and either:

> (I) was insolvent on the date that such transfer was made . . . or became
> insolvent as a result of such transfer . . .; (II) was engaged in business or a
> transaction, or was about to engage in business or a transaction, for which
> property remaining with the debtor was an unreasonably small capital; [or]
> (III) intended to incur, or believed that the debtor would incur, debts that
> would be beyond the debtor's ability to pay as such debts matured[.]

11 U.S.C. § 548(a)(1)(B)(i)-(ii).

Under section 544(b)(1), the Trustee "may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an [allowable] unsecured claim . . . ." The Trustee argues that he can avoid the relevant transfers (*i.e.*, the aggregate amount deposited into the various bank accounts maintained by the Debtors with the Defendants) under section 544(b)(1) because they are voidable under Florida law, specifically Florida Statutes § 726.105(1)(a)-(b).  Under these provisions, a transfer made within four years before the filing of a bankruptcy petition is avoidable if the debtor made such transfer "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor," or the debtor failed to receive reasonably equivalent value for the transfer and either "[w]as engaged . . . in a . . . transaction for which the remaining assets of the debtor were unreasonably small" or "intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Fla. Stat. § 726.105(1)(a)-(b).

The Trustee's fraudulent transfer claims under section 544(b), incorporating Florida law, are analogous "in form and substance" to their bankruptcy counterparts in section 548(a)(1) "and may be analyzed contemporaneously." *In re Stewart*, 280 B.R. 268, 273 (Bankr. M.D. Fla. 2001).  "The only material difference between the state and bankruptcy provisions is the favorable four-year look-back period under the Florida law." *Kapila v. Suntrust Mortg. (In re Pearlman)*, 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014).

**There Were No "Transfers"**

The Defendants argue that the Debtors' deposits into their own unrestricted bank accounts maintained at the Defendants do not constitute "transfers" within the meaning of that term under section 101(54) and Florida law, and so cannot form the basis for any of the fraudulent transfer claims in counts I and II of each of the Complaints.  The Eleventh Circuit has not ruled on this specific issue, but Eleventh Circuit case law provides persuasive support for the conclusion that there is no avoidable transfer when a debtor deposits its own funds to its own unrestricted bank account.  In addition, numerous other courts, including circuit courts of appeal, have so ruled.

Section 101(54) defines "transfer," in pertinent part, as any "mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with . . . property; or . . . an interest in property."  For this purpose, Florida statutes define the term "transfer" in an essentially identical manner: "'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset . . . ."  Fla. Stat. § 726.102(14).

Technically, when one makes a deposit with a bank, the bank becomes the owner of the funds.  It is presumed that the bank will use the funds to make loans to others.  The depositor becomes a creditor of the bank.  When the depositor seeks to withdraw funds or use them to make a payment via check or other method, the depositor is a creditor of the bank seeking payment from the bank.  *See Menotte v. United States (In re Custom Contractors, LLC)*, 745 F.3d 1342, 1350 (11th Cir. 2014).  Recognizing the debtor-creditor relationship between a depositor and a bank, some courts have ruled that the deposit of funds into the debtor's own unrestricted bank account is a "transfer" for purposes of federal and state fraudulent transfer analysis.  *See, e.g., Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279,

1282-83 (9th Cir. 1996) (applying California debtor-creditor law in ruling that a typical bank deposit is a transfer).

On the other hand, a number of courts have ruled that the special rights of a depositor vis-a-vis the bank take precedence over the technical legal relationship, at least for purposes of fraudulent transfer analysis. *See, e.g.*, *Ivey v. First Citizens Bank & Trust Co. (In re Whitley)*, 848 F.3d 205, 208 (4th Cir. Jan. 31, 2017) (holding that "when a debtor deposits or receives a wire transfer of funds into his own unrestricted checking account in the regular course of business, he has not transferred those funds to the bank that operates the account [because] the debtor is still free to access those funds at will . . . ."); *In re Prescott*, 805 F.2d 719, 729 (7th Cir. 1986) (holding that "to the extent a deposit is made into an unrestricted checking account, in the regular course of business and withdrawable at the depositor's will, it is not avoidable by the trustee") (citing *Katz v. First Nat'l Bank of Glen Head*, 568 F.2d 964, 969 (2d Cir. 1977)); *Katz*, 568 F.2d at 969 ("It is well settled that deposits in an unrestricted checking account, made in the regular course of business, do not constitute transfers within the meaning of the Bankruptcy Act."); *Wiand v. Wells Fargo Bank, N.A.*, 86 F. Supp.3d 1316, 1327 (M.D. Fla. 2015), *aff'd*, No. 15-10968, 2017 U.S. App. LEXIS 1397, 2017 WL 371939 (11th Cir. 2017) (holding that since the principal "was essentially transferring funds to and from himself, he (and the entities he controlled) never disposed of or parted with the 'assets' and therefore no transfers took place."); *In re Tonyan Constr. Co.*, 28 B.R. 714, 728-29 (Bankr. N.D. Ill. 1983) ("Ordinarily, a deposit in an unrestricted checking account does not constitute a parting with property, because it '[] results in substituting for currency, bank notes, checks, drafts, and other bankable items a corresponding credit with the bank, which may be checked against[.]'") (quoting *Citizens' National Bank of Gastonia, N.C. v. Lineberger*, 45 F.2d 522, 527 (4th Cir. 1930)); *In re Perry*, 336 F. Supp. 420, 425 (D.S.C. 1972) (finding that "deposits

and subsequent set-offs are not transfers" because they "result in a substitution of credit for various forms of commercial paper or currency" and "are withdrawable at the will of the depositor").

This line of cases recognizes that when a depositor places its own funds in an unrestricted bank account, the depositor is not truly disposing of or parting with the funds as contemplated by the definition of the term "transfer."  For all practical purposes, the depositor to a traditional demand deposit account retains complete autonomy over the funds, with the unfettered ability to withdraw them, transfer them to other accounts, use them to write checks, or use them to make wire or other electronic payments.  *Whitley*, 848 F.3d at 209-10 (summarizing cases that hold bank deposits do not constitute transfers under section 101(54)).  As is apparent from the Complaints, the Debtors in fact withdrew, transferred, and paid out from their accounts with the Defendants, in the end leaving the accounts in question empty or overdrawn.  If there was any transfer at all in making the deposits, the Debtors were transferring funds to themselves; by making the deposits the Debtors were not disposing of or parting with the funds, and so no avoidable transfers took place.  *Wiand*, 86 F. Supp. 3d at 1327-29.

That a deposit into one's own unrestricted bank account is not a transfer under fraudulent transfer law is consistent with decades of case law in this and other circuits analyzing whether a particular defendant is an initial or subsequent transferee of a fraudulent transfer.  Section 550(b) provides an important distinction between initial and subsequent transferees.  Only a subsequent transferee may take advantage of the value and good faith defense provided in that section.  Nearly all of the reported decisions involving fraudulent transfers of money involve payments made by check, wire transfer, or other

electronic transfer from a debtor's bank account.[6]  Obviously, in each such case the debtor's bank account balance resulted from deposits of various kinds.  In some cases, the deposit into a debtor's account is followed almost immediately by the debtor transferring funds to another.  If the Trustee's view here was correct, then in nearly every case where a debtor made a fraudulent transfer by check drawn on or wire transfer from a bank, the bank would have had to previously receive the funds in question, making the bank the initial transferee, and the recipient of the check or wire transfer would be a subsequent transferee, with the potential benefit of the good faith and for value defense.  Yet all of the case law points to the payee of the check or wire transfer as the initial transferee under section 550(a)(1).  Indeed, the Court was unable to find a decision where the payee on a check or wire transfer was <u>not</u> treated as the initial transferee of the funds.  This is because in this context the case law is uniform in the assumption that funds held by a debtor in a demand deposit account are the debtor's funds, a direct asset of the debtor for purposes of fraudulent transfer analysis.

The Trustee points to the legislative history of section 101(54), the definition of "transfer," which states that the term includes "[a] deposit in a bank account or similar account."  S. Rep. No. 95-989, at 27 (1987) (the "Senate Report").  Taken out of context, this statement seems to support the conclusion that every deposit into every bank account is a "transfer."  But the Senate Report "did not . . . distinguish between different types of deposits; it merely articulated the general principle that 'transfer' is meant to encompass an array of transactions."  *Ivey v. First Citizens Bank & Trust Co. (In re Whitley)*, 848 F.3d 205, 208 (4th Cir. 2017).  The Senate Report merely provides support for the breadth of the concept of transfer, to include deposits into bank accounts when that act is otherwise within the scope

---

[6] In the case law, it is extremely unusual for the courts to address fraudulent transfers of money in the form of cash.  Perhaps such transfers occur more often than we see in the reports and they are just more difficult to investigate or prove.

of the term, meaning when it involves disposing of or parting with an interest in property. When a debtor deposits funds into an account of another, or into an account where the debtor's interests are legally transcribed, for example, such a deposit may be a transfer. A debtor's regular deposits into the debtor's own unrestricted bank accounts are not transfers within the meaning of section 101(54) or Fla. Stat. § 726.102(14).

In decisions where a debtor's deposit of funds into its own unrestricted bank account is not considered a transfer, the court sometimes refers to the deposits in question as "regular deposits" or deposits made "in the regular course of business." *See, e.g.*, *In re Whitley*, 848 F.3d at 210. The Trustee argues that in this case the deposits in question were made by Mr. Simpson to perpetuate his fraudulent scheme and so were not "regular." Yet it is obvious from the decisions cited by the Trustee that the term "regular" refers to typical banking transactions between a bank and its customer and not to the business of the customer itself. For example, in *In re Whitley*, the funds deposited with the defendant bank resulted from the debtor's Ponzi scheme. *Id*. at 206-07.

Because all of the transfers alleged here involve deposits by the Debtors of their own funds into their own unrestricted bank accounts, the Complaints fail to describe any "transfers" that are avoidable under section 548 or section 544 incorporating Florida law. The Trustee thus has no claims under section 548 or 544. Counts I and II of the Complaints must be dismissed on this ground alone.

### The Defendants Are Not "Transferees"

The Defendants argue that they are not transferees of the deposited funds within the meaning of the relevant statutes because the Defendants lacked control over the deposited funds, making the Defendants "mere conduits" under Eleventh Circuit precedent. *See Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312, 1323 (11th Cir. 2010). Even if the Debtors' deposits to their own unrestricted bank accounts could be considered transfers for purposes

of fraudulent transfer analysis, the Defendants are not transferees from whom the Trustee may recover.

Section 550(a)(1) provides that, to the extent a transfer is avoided under sections 548 or 544, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from[,]" among others, "the initial transferee of such transfer."  Neither the Bankruptcy Code nor its legislative history define the term "transferee."  *In re Harwell*, 628 F.3d at 1317 (citing *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)).  As the Eleventh Circuit has explained, "[t]he term 'initial transferee' is a term of art whose meaning in any given transaction is not always straightforward."  *Andreini & Co. v. Pony Express Delivery Servs., Inc. (In re Pony Express Delivery Servs., Inc.)*, 440 F.3d 1296, 1300 (11th Cir. 2006).  "A 'literal or rigid interpretation' of the term leads to the conclusion that 'the first recipient of the debtor's fraudulently-transferred funds is an initial transferee.'"  *In re Custom Contractors, LLC*, 745 F.3d at 1349 (quoting *In re Harwell*, 628 F.3d at 1322).

"Recognizing the inequity that would result if every initial recipient of fraudulently-transferred funds could be forced, as an initial transferee, to return the funds to the bankrupt's estate, [the Eleventh Circuit] crafted an exception—grounded in the equitable powers of the bankruptcy court—known as the mere conduit or control test."  *Id.*  The hallmark of the mere conduit or control test is the recognition that certain recipients of a debtor's assets cannot legally exercise control over those assets—can never legally use the assets for their own benefit—and so should not be held responsible for merely holding and/or disposing of the assets for the benefit of the debtor or another.  *See In re Harwell*, 628 F.3d at 1317-24 (reviewing the development of the mere conduit or control test).  This defense, which is "based on, and defined by, equity," requires the Court to take "a flexible, pragmatic,

equitable approach," considering a transaction in its entirety, rather than focusing in on the particular transfer in question.  *Id*. at 1322.

A debtor's own bank, where the debtor maintains its demand deposit accounts, is nearly always a conduit that cannot be held liable under section 550.  As discussed above, when one deposits funds into a typical demand deposit account, the bank technically becomes the owner of the funds.  The bank may use the funds to make loans to others.  The depositor is a creditor of the bank, with the right to demand immediate repayment at any time.  *See In re Custom Contractors, LLC*, 745 F.3d at 1350.  But the bank-depositor relationship is not a typical debtor-creditor relationship.  The Eleventh Circuit has repeatedly pointed to the depository bank as the ultimate example of a conduit for purposes of transferee analysis.  For example, the Eleventh Circuit recently stated, "[o]ur case law . . . stands for the proposition that, when a bank receives funds in the form of a deposit, the attendant obligations owed to the transferor—namely to return the funds upon request—are sufficiently important that we will not hold the bank liable as an initial transferee in spite of the significant control it exercises over the funds."  *Id*.; *In re Harwell*, 628 F.3d at 1324 ("In the vast majority of cases, a client's settlement funds transferred in and out of a lawyer's trust account will be just like bank transfers, and lawyers as intermediaries will be entitled to mere conduit status because they lack control over the funds.  Mere conduits, such as lawyers and banks, do not have an affirmative duty to investigate the underlying actions or intentions of the transferor.").  Following this Eleventh Circuit precedent, the Sixth Circuit recently ruled that a bank will not be held liable as an initial transferee because the bank does not gain dominion and control over a debtor's deposits by virtue of the bank being the debtor's depository bank.  *Meoli v. Huntington Nat'l Bank*, 848 F.3d 716, 725-28 (6th Cir. 2017).  Other courts in this circuit have regularly applied this concept.  *See, e.g., Super Vision International, Inc., v. Mega*

*International Commercial Bank Co.*, 534 F. Supp. 2d 1326, 1344 (S.D. Fla. 2008) (granting motion to dismiss a fraudulent transfer claim against a bank which was alleged to have accepted the debtor's transfers of funds into accounts owned by the debtor at the bank) (*citing In re Chase & Sanborn Corp.*, 848 F.2d at 1200); *In re Colombian Coffee Co.*, 75 B.R. 177, 179 (S.D. Fla. 1987) ("[I]t would be both problematical and preposterous were courts to" find a depository bank a transferee under federal bankruptcy law when the bank "possessed no discretion with respect to the disposition of the funds -- it was constrained to follow the debtor's instructions.").

To establish the mere conduit defense, a defendant must show both that it did not have legal control over the assets that it received and that the defendant "acted in good faith and as an innocent participant in the fraudulent transfer." *In re Harwell*, 628 F.3d at 1323.[7] The Trustee argues that he need not prove the Defendants' lack of good faith at this stage of the proceedings, as the mere conduit defense is an affirmative defense, the burden of which falls on the Defendants.

The mere conduit defense is an affirmative defense to fraudulent transfer liability. *In re Palm Beach Fin. Partners, L.P.*, 488 B.R. at 769 (citing *Perlman v. Bank of Am., N.A.*, 2012 U.S. Dist. LEXIS 71663, at *5, 2012 WL 1886617, at *2 (S.D. Fla. 2012)); *Perlman v. Bank of*

---

[7] The context of *Harwell* is instructive. The defendant was the debtor's former counsel. *In re Harwell*, 628 F.3d at 1314. In anticipation of collection attempts on a judgment entered in another state, the debtor transferred, or caused to be transferred, a substantial sum to his counsel, who placed it in his attorney trust account. *Id*. The defendant (former counsel) then assisted the debtor in avoiding paying the substantial judgment by making distributions from the trust account to the debtor and others at the debtor's direction. *Id*. at 1314-15. In ruling on a motion for summary judgment, the bankruptcy court had assumed that the defendant was the mastermind of the debtor's scheme to defraud the judgment creditor, but assumed that under prevailing Eleventh Circuit precedent the defendant lacked legal control over the funds and could not be held liable as a transferee. *Id*. at 1316, 1323. The Eleventh Circuit focused on the obvious lack of good faith of the defendant, which was assumed by the bankruptcy court for purposes of the ruling. *Id*. at 1324. The Eleventh Circuit stated that the mere conduit or control defense required the defendant to prove that it lacked control over the asset and also that it acted in good faith in receiving the asset. *Id*. at 1323-24. The Eleventh Circuit remanded the matter for the bankruptcy court to consider both whether the defendant had legal control over the funds in his attorney trust account and whether he acted in good faith in receiving them. *Id*. at 1324. The Court notes that in *Harwell* there was in fact a transfer as the debtor gave his funds to his counsel who placed them in counsel's attorney trust account, held in counsel's name. *Id*. at 1314-15.

*Am., N.A.*, 561 Fed. Appx. 810, 813 (11th Cir. 2014) ("[T]he 'mere conduit' theory must be affirmatively proved by the one seeking to obtain its protection."). It is not necessary for a complaint to anticipate defenses. *In re Palm Beach Fin. Partners, L.P.*, 488 B.R. at 771. For this reason, it is generally not proper to dismiss a complaint because it fails to negate an affirmative defense. *Id.* The Trustee is correct on these legal points.

On the other hand, a court may consider an affirmative defense in resolving a motion to dismiss when the complaint "affirmatively and clearly shows the conclusive applicability of the defense to bar the action." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1277 (11th Cir. 2004); *Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011). In this case, the Trustee had ample reason to include in the Complaints allegations tending to negate the Defendants' good faith. In addition to the fraudulent transfer claims, the Trustee claims that the Defendants aided and abetted the conversion of investor assets by Mr. Simpson through the Debtors. The Trustee alleges in the Complaints that there were circumstances that should have lead the Defendants to investigate the Debtors and, had they done so, the Defendants would have discovered Mr. Simpson's illegal scheme. The Trustee had the incentive to paint as bleak a picture as possible of the Defendants' knowledge and actions. In the Trustee's briefs on the present Motions to Dismiss, the Trustee does not even suggest that there are other facts that could prove useful in this regard.

In effect, the Trustee argues that the Defendants were on inquiry notice of Mr. Simpson's fraud and thus did not receive the deposits in good faith. However, as the Eleventh Circuit has repeatedly confirmed, under Florida law the Defendants had no duty to investigate transactions involving the Debtors' own demand deposit accounts. *Perlman v. Wells Fargo Bank, N.A.*, 559 Fed. Appx. 988, 993 (11th Cir. 2014) (citations omitted); *Lawrence v. Bank of Am., N.A.*, 455 Fed. Appx. 904, 907 (11th Cir. 2012). "Mere conduits,

such as lawyers and banks, do not have an affirmative duty to investigate the underlying actions or intentions of the transferor." *In re Harwell*, 628 F.3d at 1324. If this Court were to rule that inquiry notice of the Debtor's fraudulent scheme is sufficient to negate the good faith of the Defendants, this would be tantamount to requiring them to have investigated their depository clients, a burden inconsistent with applicable law. Only plausible allegations of actual knowledge of the depositor's illegal acts are sufficient to negate the banks' good faith.

When the fraudulent transfer defendant is a banking institution that conducts routine banking services and the transfer in question is a deposit into the debtor's own demand deposit account, lack of good faith may only be proven by showing that the defendant actually knew that the debtor was acting in an illegal manner. Here, the Trustee also claims that the Defendants aided and abetted Mr. Simpson's conversions, claims which require the Trustee to allege facts that plausibly would support a finding that the Defendants had actual knowledge of Mr. Simpson's scheme. Yet, as discussed more fully below, there is nothing in the Complaints that would lead the Court to believe that any of the Defendants had actual knowledge of Mr. Simpson's illegal acts.

The Defendants acted in good faith in receiving the Debtors' deposits into their own bank accounts. The accounts in question were routine demand deposit accounts. Based on the Trustee's own Complaints, the Debtors maintained complete autonomy over those accounts. In light of these facts, none of the Defendants are "transferees" from whom the Trustee may seek judgment under section 550. Counts I and II of each of the Complaints must be dismissed on this ground alone.

### Other Pleading Deficiencies

In the Motions to Dismiss, the Defendants argue that the Trustee's fraudulent transfer claims suffer from several pleading deficiencies and, therefore, the Trustee's

fraudulent transfer claims must be dismissed as a matter of law.  The Court will analyze each argument in turn.

The Defendants[8] argue that the Trustee's fraudulent transfer claims fail as a matter of law because the Complaints do not allege that the estate was damaged, *i.e.*, that the transfers at issue did not diminish the assets of the estate.  For every dollar deposited, the Debtors subsequently withdrew the same amount, and in many cases overdrew the deposit accounts.

The plain text of both section 548(a)(1) and Florida law makes clear that the inquiry is whether the Debtor intended to hinder, delay, or defraud its present or future creditors when it made the subject transfer, not whether the Debtor's creditors were actually harmed because the transfer diminished assets later included in the Debtor's bankruptcy estate. *Development Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 793-94 (Bankr. S.D. Fla. 2000) (applying this analysis to rule that payment of a pre-existing debt may constitute a fraudulent transfer).  Other provisions of the relevant statutes, *e.g.*, section 548(c) and Fla. Stat. § 726.109(1), provide affirmative defenses that focus on whether the defendant received a transfer "for value."  *Id.* at 794.  Whether an alleged fraudulent transfer resulted in a reduction of assets later available for administration in a bankruptcy is just one factor that may be used to rebut a possible finding of actual intent to hinder, delay, or defraud.  Lack of diminution of assets of the estate does not, as a matter of law, negate a fraudulent transfer claim, and the Motions to Dismiss cannot be granted on that basis.

The Defendants argue that the Complaints lack specific allegations to support the Trustee's claims that the bank deposits at issue were made with actual intent to hinder,

---

[8] Because the Defendants explicitly adopted each other's arguments in the Motions to Dismiss, the Court treats each argument made by a Defendant as being made by all of the Defendants.

delay, or defraud creditors and, therefore, the Trustee's actual fraud theories fail as a matter of law. In particular, the Defendants argue that the Trustee fails to allege facts that would support the traditional badges of fraud.

Because actual intent to hinder, delay, or defraud is difficult to prove, courts look to the totality of the circumstances surrounding the allegedly fraudulent transfer, and this often involves analyzing the traditional badges of fraud. *In re Model Imperial, Inc.*, 250 B.R. at 790-91. The commonly listed badges of fraud include: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was not disclosed or was concealed; (4) before the transfer was made the debtor had been sued or threatened with suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. *Id.* at 791.[9]

Contrary to the Defendants' suggestions, the traditional badges of fraud are not the sole indicators of actual fraudulent intent. The traditional badges of fraud represent

---

[9] Similarly, under Florida law, in determining actual intent to defraud courts may consider whether:

> (a) The transfer or obligation was to an insider. (b) The debtor retained possession or control of the property transferred after the transfer. (c) The transfer or obligation was disclosed or concealed. (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit. (e) The transfer was of substantially all the debtor's assets. (f) The debtor absconded. (g) The debtor removed or concealed assets. (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred. (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. (j) The transfer occurred shortly before or shortly after a substantial debt was incurred. (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Fla. Stat. § 726.105(2).

examples of indicators of actual fraudulent intent, culled from decades of case law. They are intended to be guideposts—as opposed to ineluctable factors—in the Court's analysis of the totality of the circumstances to determine whether a transfer was made with actual fraudulent intent. That the Complaints here do not appear to focus on the traditional badges of fraud is not fatal. Instead, the Court must look to the factual allegations in the Complaints to determine whether, if proven, they would support a finding of actual intent to hinder, delay, or defraud.

Before the Court engages in a review of the allegations in the Complaints intended to support a finding of actual intent to defraud, it is useful to consider what needs to be proven in this regard. In prosecuting a fraudulent transfer claim based on actual intent, it is typically not sufficient to show that the debtor intended to defraud someone and the debtor also made a transfer. Just because a debtor is involved in a fraudulent scheme does not mean that every transfer made by that debtor is made with fraudulent intent.[10] In order to prosecute a claim based on actual intent to hinder, delay, or defraud a creditor, the plaintiff must show that the alleged fraudulent intent is related to the transfers sought to be avoided. *Bakst v. Bank Leumi, USA (In re D.I.T., Inc.)*, 561 B.R. 793, 803 (citing *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56-57 (2d Cir. 2005)).

> The most common example is when a debtor transfers assets to an insider, for no consideration, when the debtor is involved in significant litigation or is being pursued by creditors, for the obvious purpose of placing assets beyond the reach of creditors. In such a case, the transfer achieves the debtor's fraudulent end.

---

[10] There are limited circumstances where a debtor's fraudulent intent in making certain transfers is presumed. For example, if a debtor is perpetrating a Ponzi scheme, a transfer made in furtherance of that Ponzi scheme is deemed to have been made with actual fraudulent intent. *Welt v. Publix Super Markets, Inc. (In re Phoenix Diversified Inv. Corp.)*, 2011 Bankr. LEXIS 4100, at **7-9, 2011 WL 2182881, at *3 (Bankr. S.D. Fla. 2011). However, the transfer must be specifically in furtherance of the fraudulent scheme and not some unrelated transaction. *Id*.

*Id.*  In the present case, the transfers at issue are the Debtors' deposits into their own bank accounts maintained at TD Bank, PNC Bank, and JPMC Bank.  The Complaints must include allegations of fact tending to show that the Debtors had fraudulent intent in making those deposits.

The Trustee alleges that Mr. Simpson regularly caused Rollaguard to transfer money to the Shamrock Entities, thereby placing such funds out of the reach of Rollaguard's creditors and likely using such funds for Mr. Simpson's personal benefit.  But these allegations focus on what happened to the funds after they were in Rollaguard's accounts, not Rollaguard's deposits into those accounts, the alleged transfers at issue here.  That Rollaguard, acting through Mr. Simpson, had fraudulent intent in transferring funds <u>out</u> of its bank accounts maintained at the Defendants is not probative on the issue of whether Rollaguard had fraudulent intent when it deposited funds <u>into</u> its own bank accounts to begin with.

The Trustee alleges that the Debtors removed property from the reach of their creditors by depositing the monies in their own bank accounts.  Let us focus on the actual transfers alleged in this case.  It is not alleged that any Debtor deposited its funds into an account owned by another Debtor.  The "transfers" in question are Rollaguard's deposits into Rollaguard's bank accounts, and Shamrock Jewelers, Inc.'s deposits into Shamrock Jeweler's Inc.'s bank accounts, and Shamrock Jewelers Loan & Guarantee, LLC's deposits into Shamrock Jewelers Loan & Guarantee, LLC's bank accounts.  The deposit of a Debtor's funds into its own bank account, by itself, did not remove those funds from the reach of that Debtor's creditors.  The Debtors transferred those funds after they had been deposited, but those later transfers are not at issue in the fraudulent transfer claims here.

The Trustee alleges that the Debtors did not receive reasonably equivalent value in exchange for the deposits.  Again, nowhere in the Complaints does the Trustee suggest that

a Debtor deposited its funds into the account of a different Debtor.  The "transfers" at issue here are each Debtor's deposits into its own bank account.  Each Debtor maintained complete autonomy over the entirety of those funds.  Indeed, as is apparent from the Complaints, the Debtors used all of those funds by making transfers and payments from their own accounts.  If the deposit of one's funds into one's own demand deposit bank account constitutes a transfer at all, then the depositor always receives reasonably equivalent value, indeed exactly equivalent value, because the depositor has the unfettered ability to withdraw the same sum.

The Trustee alleges that the Debtors were insolvent at the time of the deposits or became insolvent as a result of the deposits.  The fact that a Debtor was insolvent at the time of a transfer or was made insolvent by the transfer tends to support a claim of actual fraud.  In this particular case, because the "transfers" are merely each Debtor depositing its own funds in its own demand deposit account, that the subject Debtor was insolvent at the time has no bearing on whether the deposit was made with actual fraudulent intent.  Each Debtor's overall assets remained unchanged as a result of the deposits.  For the same reason, it is logically impossible that the deposits at issue here caused any Debtor to become insolvent.  The Debtors had funds that they deposited into their own bank accounts.  Before the deposits, the Debtors either had possession of the funds or the right to collect them from another.  After the deposits, the Debtors' bank accounts, over which they had complete autonomy, were augmented by the exact same amount.  There was no change in any Debtor's solvency as a result of taking monies that were already theirs and depositing them in their own bank accounts.   This Court is routinely called on to determine the solvency of debtors.  Whether a current asset takes the form of a collectible instrument, cash, or a bank account has no impact on the Court's solvency analysis.  These assets are equivalent.

The Trustee alleges that Mr. Simpson was causing the Debtors to engage in various fraudulent or deceptive schemes at the time of the deposits.  That the Debtors, through Mr.

Simpson, were obtaining investments they never intended to repay, and moving funds among themselves and for the benefit of Mr. Simpson, does not mean that when they first put their own funds in their own bank accounts those deposits were made with actual intent to defraud the investors or any other creditor.  The Debtors' fraudulent acts came after the funds were deposited—when they were withdrawn, transferred to accounts of other Debtors, or paid to Mr. Simpson or potentially third parties.  In other words, there is no connection between the transfers at issue here, meaning the Debtors' deposits into their own bank accounts, and the Debtors' collective intent, acting through Mr. Simpson, to fraudulently obtain investments they did not intend to return.

The Trustee alleges that the Debtors were not paying their debts as they became due. This allegation is sometimes helpful to support the conclusion that a failing debtor made a transfer with the intent to place the asset out of view of the debtor's creditor body generally. In this case, the allegation lends nothing to the question of whether the Debtors' deposits into their own unrestricted bank accounts were made with fraudulent intent, as those deposits had no impact on the Debtors' ability to pay creditors.

Finally, the Trustee alleges that the Debtors transferred funds to Mr. Simpson directly or to others for Mr. Simpson's personal gain.  It is of course possible that transfers of funds from one Debtor's bank account to another Debtor's bank account, to Mr. Simpson himself, or to others for Mr. Simpson's benefit, may constitute fraudulent transfers.  But the fact that the Debtors made fraudulent transfers <u>from</u> their bank accounts with the Defendants does not mean that the Debtors' deposits of their own funds <u>into</u> their own bank accounts likewise was done with fraudulent intent.

The Complaints do not contain sufficient allegations to plausibly support the conclusion that the Debtors deposited their own funds into their own unrestricted bank accounts with the intent to hinder, delay, or defraud creditors, as required by the relevant

statutes.  The Trustee's actual fraud claims set out in counts I and II of each of the Complaints are due to be dismissed on this ground alone.

The Defendants argue that the Trustee's fraudulent transfer claims based in constructive fraud must also fail because the Debtors received reasonably equivalent value in exchange for the deposits.  Simple logic proves this argument.  Before each of the bank deposits, the Debtors had a current asset.  After the alleged transfers, the Debtors had exactly the same value in their own bank accounts over which they had complete autonomy.  There was no change in the Debtors' overall assets as a result of the deposits into the Debtors' own bank accounts.  To the extent there was a transfer at all, the Debtors received exactly equivalent value.  *Cf. Chase & Sanborn Corp.*, 848 F.2d at 1198 n.7 ("[W]hen the debtor making an allegedly fraudulent transfer is closely related to the party benefitting from the transfer, courts have often found reasonably equivalent value based simply on the benefit to the latter party.").  The Complaints do not contain, indeed under the facts here the Complaints could not contain, allegations sufficient to support the conclusion that the Debtors did not receive reasonably equivalent value as a result of the deposits of their own funds into their own bank accounts, as required by the relevant statutes.  The Trustee's constructive fraud theories set out in counts I and II of each of the Complaints must be dismissed.  Combined with the Court's ruling above, with regard to the Trustee's actual fraud theories in the same counts, this means that all relief requested in counts I and II of each of the Complaints must be dismissed on account of the Trustee's failure to plead facts that plausibly support the claims presented.

The Defendants argue that the Trustee's fraudulent transfer claims based on section 544, incorporating Florida law, must be dismissed because the Trustee fails to plead the existence of an unsecured creditor with standing to avoid the deposits, *i.e.*, a "triggering creditor."  *See In re Tabor*, 2016 WL 346100, at *2 (Bankr. S.D. Fla. 2016).  Under present

law, the Complaints must include factual allegations that plausibly support each element of the claim.[11]   The existence of a triggering creditor is an explicit element of the Trustee's claims under section 544.   It is not sufficient to allege generally that there are triggering creditors.   The Trustee must identify by name at least one creditor with an allowable unsecured claim that could have sought avoidance of the transfer in question under Florida law.   *In re D.I.T., Inc.,* 561 B.R. at 800.   The Trustee need not allege the specific amount of any unsecured claim or the specific date when such claim arose.   *Id.*   None of the Complaints identifies a specific triggering creditor.[12]   The Trustee's claims under section 544, incorporating Florida law, contained in counts I and II of each of the Complaints must be dismissed for this reason alone.

## COUNTS III, IV AND V

### The Doctrine of *In Pari Delicto*

The Defendants argue that the doctrine of *in pari delicto* bars the Trustee's state law claims for aiding and abetting Mr. Simpson's conversions (counts III and IV) and for negligence in processing Mr. Simpson's withdrawals from the Debtors' bank accounts (count V).   The Defendants argue that Mr. Simpson was an agent of the Debtors, that Mr. Simpson engaged in fraudulent conduct in order to defraud creditors, and that Mr. Simpson's wrongful acts should be imputed to the Debtors.   If Mr. Simpson's fraudulent conduct is imputed to the Debtors, then the doctrine of *in pari delicto* would prevent the Debtors from pursuing the aiding and abetting and negligence claims against the Defendants.   Because the Trustee

---

[11] While a number of courts previously ruled that it was not necessary to name specific triggering creditors, in light of the Supreme Court's rulings in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it is now necessary to include specific allegations to support this element of the claim.   The plaintiff must name a specific creditor or creditors.   It is not sufficient to merely draw the Court's attention to the schedules of liabilities filed in a case, particularly if this is done only in connection with a motion to dismiss and not in the complaint itself.

[12] The Court notes that there must be a specific triggering creditor identified for each alleged transfer.   It is possible that the same creditor or creditors may serve this purpose for a number of transfers.

steps into the shoes of the Debtors, the Trustee likewise would be prevented from pursuing the Defendants on these claims. *See Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1152 (11th Cir. 2006).

"The doctrine of *in pari delicto* is an equitable doctrine that states a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *Edwards*, 437 F.3d at 1152 (quotation and citation omitted); *World Capita Commc'n's., Inc. v. Island Capital Mgmt., LLC (In re Skyway Commc'n's. Holding Corp.)*, 389 B.R. 801, 809 (Bankr. M.D. Fla. 2008). The doctrine of *in pari delicto* is essentially an application of the law of agency. The Court looks to state law to determine if an agent's wrongful conduct should be imputed to a corporate principal. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 89 (1994). Under Florida law,

> [w]here it is shown, without dispute, that a corporate officer's fraud intended to and did benefit the corporation, to the detriment of outsiders, the fraud is imputed to the corporation and is an absolute defense to the corporation's action against its accounting firm for negligent failure to discover the fraud.

*Seidman & Seidman v. Gee*, 625 So. 2d 1, 3 (Fla. 3d DCA 1992).

If, however, an agent's misconduct is calculated to benefit the agent and harms the corporation, the agent has forsaken the corporation and acts only for himself. *O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039, 1045 (Fla. 2d DCA 2007). In such a case, the agent's misconduct is not imputed to the principal. Courts call this the "adverse interest" exception to imputation of an agent's knowledge and conduct to its principal. *Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998). If an agent's misconduct is not imputed to the principal, then the corporation is free from wrongdoing and is not subject to the *in pari delicto* defense. Jonathan Witmer-Rich & Mark Herrmann, *Corporate Complicity Claims: Why There is No Innocent Decision-Maker Exception to Imputing an Officer's Wrongdoing to a Bankrupt Corporation*, 74 TENN. L. REV. 47, 60 (2006). Courts examine whether the

corporation received any benefit from the agent's misconduct to determine whether the adverse interest exception applies in a particular case. *Gee*, 625 So. 2d at 3.

Even if the agent's misconduct is calculated to benefit only the agent, to the detriment of its principal, imputation is still proper where the "sole actor" doctrine applies. *O'Halloran*, 969 So. 2d at 1045. The "sole actor" doctrine provides that the adverse interest exception to the imputation rule is inapplicable "where the transaction on behalf of the principal is entrusted solely to the officer or agent having the knowledge." *Nerbonne N.V. v. Lake Bryan Int'l Props.*, 685 So. 2d 1029, 1031 (Fla. 5th DCA 1997). "[W]here the officer in question is the sole representative of that corporation, there is no one to whom to impart his knowledge and no one from whom he may conceal it." *Gordon v. Basroon (In re Plaza Mortg. & Fin. Corp.)*, 187 B.R. 37, 45 n.6 (Bankr. N.D. Ga. 1995) (citation omitted). When a corporation has multiple officers and directors, the sole actor rule may apply when "all relevant shareholders and decision-makers were involved in the fraud." *Ernst & Young v. Bankruptcy Servs. (In re CBI Holding Co.)*, 311 B.R. 350, 373 (S.D.N.Y. 2004), *aff'd in part, rev'd on other grounds by* 529 F.3d 432 (2d Cir. 2008). Courts thus consider whether there exist relevant decision-makers who are innocent of the fraud. Witmer-Rich & Herrmann, *supra*, at 62.

Whether the *in pari delicto* doctrine should be applied at all depends on the relative culpability of the plaintiff and the defendant. "[U]nless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater, the *in pari delicto* defense should not be allowed." *Pinter v. Dahl*, 486 U.S. 622, 636 (1988). In other words, the *in pari delicto* defense is applicable only where, "as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress . . . ." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310-11 (1985).

The affirmative defense of *in pari delicto* typically requires proof of facts asserted by the defendant and, as such, is seldom an appropriate ground for granting a motion to dismiss. *Pearlman v. Alexis*, 2009 U.S. Dist. LEXIS 88546, at *7 (S.D. Fla. 2009); *In re Skyway Commc'ns Holding Corp.*, 389 B.R. at 810.  The defense may be asserted at the motion to dismiss stage only where the facts establishing the defense: (1) are definitively ascertainable from the complaint and other allowable sources of information, and (2) suffice to establish the affirmative defense with certitude.  *Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320, 324 (1st Cir. 2008) (quotation omitted).

The Defendants argue that the harm alleged in the Complaints resulted from the Debtors' own participation in the fraud through the fraudulent conduct of Mr. Simpson and, therefore, the Trustee is barred as a matter of law from pursing the aiding and abetting and negligence claims against the Defendants.  The Trustee argues that Mr. Simpson's fraudulent conduct cannot be imputed to the Debtors because Mr. Simpson acted adversely to the interests of the Debtors and because the Debtors did not benefit from Mr. Simpson's fraudulent conduct.  Further, the Trustee argues that there are innocent members of the Debtors' management who were without knowledge of Mr. Simpson's harmful acts.  The Defendants respond that because Mr. Simpson was completely in control of the Debtors he was the "sole actor" and his bad acts should be attributed to the Debtors, barring the Trustee's claim.

The Trustee alleges that Mr. Simpson caused Rollaguard harm and did not act in Rollaguard's best interest, and so his acts should not be attributed to Rollaguard.  According to the Complaints, Mr. Simpson defrauded creditors by raising capital for the purpose of manufacturing and selling the Rollaguard security case.  Mr. Simpson then misappropriated these capital investments raised on behalf of Rollaguard for his personal use without any corresponding benefit to Rollaguard.  Mr. Simpson was not the sole manager of Rollaguard.

Mr. Tabony was the Chief Financial Officer of Rollaguard.  Indeed, Mr. Tabony caused Rollaguard to file its chapter 7 petition.  According to the Complaints, Mr. Tabony was without knowledge of any wrongdoing by Mr. Simpson that caused harm to Rollaguard.  Mr. Tabony was not complicit or involved in Mr. Simpson's fraud.  Accordingly, it is not clear from the Complaints that Mr. Simpson's misconduct can be attributed to Rollaguard.  For these reasons, at this stage of the proceedings it is not appropriate to dismiss counts III and V as they relate to Rollaguard on account of the *in pari delicto* defense.

According to the Complaints, the Shamrock Entities (Shamrock Jewelers, Inc., and Shamrock Jewelers Loan & Guarantee, LLC) operated a legitimate jewelry store in Florida from approximately 1965 to 2015.  During that time, the Shamrock Entities sold, purchased, and repaired fine jewelry.  The Shamrock Entities also claimed to engage in pawn brokerage, but there was in fact no pawn brokerage business.  The purported pawn brokerage was just another method for Mr. Simpson to defraud investors.  It is not clear from the Complaints whether the Shamrock Entities benefitted from Mr. Simpson's fraudulent conduct in connection with the purported pawn brokerage business.

Mr. Simpson was not the sole manager of Shamrock Jewelers, Inc.  Debra Simpson, Mr. Simpson's spouse, was the Vice President of Shamrock Jewelers, Inc.  According to the Complaints, Ms. Simpson was without knowledge of any wrongdoing by Mr. Simpson that caused harm to Shamrock Jewelers, Inc.  Ms. Simpson was not complicit or involved in Mr. Simpson's fraud.  Based on the Complaints, it is not clear whether Mr. Simpson's misconduct should be attributed to Shamrock Jewelers, Inc.  For this reason, at this stage of the proceedings it is not appropriate to dismiss counts IV and V as they relate to Shamrock Jewelers, Inc. on account of the *in pari delicto* defense.

On the other hand, Mr. Simpson was solely responsible for the actions of Shamrock Jewelers Loan & Guarantee, LLC.  Since there was no one else to whom to impart Mr.

Simpson's knowledge and actions, and no one from whom Mr. Simpson could conceal them, Mr. Simpson's fraudulent conduct is imputed to Shamrock Jewelers Loan & Guarantee, LLC. Accordingly, counts IV and V of the Complaints must be dismissed in part to the extent they seek damages based upon withdrawals from deposit accounts in the name of Shamrock Jewelers Loan & Guarantee, LLC.

### Aiding and Abetting Conversion

In counts III and IV of the Complaints, the Trustee alleges that the Defendants are liable for aiding and abetting Mr. Simpson's conversions of monies from the Debtors. The Defendants argue that the Complaints fail to sufficiently plead that the Defendants had actual knowledge of Mr. Simpson's conversions and that the Defendants rendered substantial assistance to Mr. Simpson in the course of his conversions.

Under Florida law, to state a claim for aiding and abetting a plaintiff must allege: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abetter; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Lawrence*, 455 Fed. Appx. at 906-07 (citing *AmeriFirst Bank v. Bomar*, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991); *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.*, 917 So. 2d 368, 372 (Fla. 5th DCA 2005)). There is no dispute that an underlying violation exists. Mr. Simpson misappropriated funds from the Debtors for his own personal use and other improper uses. The Court will focus on the latter two elements.

"[W]hen a claim of aiding and abetting is asserted against a bank, the second element—knowledge—will only be satisfied if the plaintiff pleads facts demonstrating that the bank had 'actual knowledge' of the wrongdoings." *Perlman*, 559 Fed. Appx. at 993 (citing *Lawrence*, 455 Fed. Appx. at 907). "And while actual knowledge may be shown by circumstantial evidence, the circumstantial evidence must demonstrate that the aider and

abettor actually knew of the underlying wrongs committed." *Id.* (citing *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013)).  Importantly, in the context of aiding and abetting claims against banks, Florida law does not require banks to investigate their customers' transactions.  *Lawrence*, 455 Fed. Appx. at 907 (citing *Home Fed. Sav. & Loan Ass'n of Hollywood v. Emile*, 216 So. 2d 443, 446 (Fla. 1968)); *O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1205 (11th Cir. 2003) (finding that banks have the "right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds").

The allegations in the Complaints, taken together, do not raise a plausible inference that any of the Defendants actually knew Mr. Simpson was engaged in conversion.  At most, some of his actions were suspicious.  Mere suspicion is not sufficient to trigger any obligation by the Defendants to investigate.  *Lawrence*, 455 Fed. Appx. at 907; *Perlman*, 559 Fed. Appx. at 993-94.  Even the fact that TD Bank froze two of the Shamrock Entities' bank accounts, without more, is not sufficient to plausibly infer actual knowledge of Mr. Simpson's conversions.  *Perlman*, 559 Fed. Appx. at 993-94.  Since the Complaints fail to plead sufficient facts to support a plausible inference that the Defendants had actual knowledge of Mr. Simpson's conversions, counts III and IV of the Complaints must be dismissed on this basis alone.

In addition, counts III and IV do not contain sufficient allegations to plausibly support the inference that the Defendants rendered substantial assistance to Mr. Simpson's conversions.  Under Florida law, to satisfy the substantial assistance element, a plaintiff must allege (1) recklessness and a duty to disclose and/or (2) conscious intent.  *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010 (11th Cir. 1985); *Court Appointed*

*Receiver of Lancer Offshore, Inc. v. Citco Group Ltd.*, 2011 U.S. Dist. LEXIS 34582, at *26 (S.D. Fla. 2011).

There is nothing in the Complaints that would lead the Court to conclude that any of the Defendants consciously intended to assist Mr. Simpson in conversions. Thus, the Trustee must be attempting to show that the Defendants were reckless and had a duty to disclose.

The Trustee alleges that the Defendants rendered substantial assistance by violating banking regulations and customary banking practices which, if followed, would have resulted in earlier detection of Mr. Simpson's wrongdoing and its exposure. The aiding and abetting claims require the Defendant's acts to be reckless. The allegations in the Complaints do not even come close to this standard. Red flags and mere suspicions are insufficient to trigger any obligation by the Defendants to investigate. *Lawrence*, 455 Fed. Appx. at 907; *Perlman*, 559 Fed. Appx. at 993-94. Such "red flags" or suspicions are not sufficient to elevate the Defendants' alleged actions into the realm of "substantial assistance." Since the Complaints do not plead sufficient facts to plausibly support the inference that any of the Defendants rendered substantial assistance to Mr. Simpson's conversions, counts III and IV must be dismissed on this basis alone.

### Negligence

In count V of the Complaints, the Trustee claims that the Defendants were negligent in processing Mr. Simpson's withdrawals from the Debtors' bank accounts. The Trustee alleges that state and federal law, "including but not limited to Chapter 670 of the Florida Statutes," imposed a duty of care on the Defendants "to correctly, cautiously, and prudently process [the withdrawals] subject to commercially reasonable security procedures." The Trustee alleges that the Defendants breached such a duty by violating federal banking regulations and/or lacking good faith in processing the withdrawals due to their actual or constructive knowledge of Mr. Simpson's suspicious activities. As a result, the Trustee

alleges that the Defendants actually and proximately caused damage to the Debtors in the amounts withdrawn from the various bank accounts maintained at the Defendants. In the Motions to Dismiss, the Defendants argue that they did not owe the Debtors any duty to investigate or stop Mr. Simpson's fraudulent conduct because banks do not owe customers an independent duty to monitor their transactions to protect against misappropriation. The Defendants also argue that Chapter 670 of the Florida Statutes, Florida's statute governing commercial fund transfers, is not a source of duty for a negligence claim.

To plead a claim for negligence under Florida law, the Trustee must plausibly allege a duty, a breach of that duty, causation, and damages. *Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329, 1339 (11th Cir. 2012). Under Florida law, "establishing the existence of a duty . . . is a minimum threshold legal requirement that opens the courthouse doors to the moving party, and is ultimately a question of law for the court rather than a jury." *Williams v. Davis*, 974 So. 2d 1052, 1057 n.2 (Fla. 2007) (citing *McCain v. Florida Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992)); *Virgilio*, 680 F.3d at 1339. A duty of care may arise from four sources: "(1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case." *Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003) (quoting *McCain*, 593 So. 2d at 503 n.2).

The Trustee seeks to establish a duty of care under state and federal law, "including but not limited to Chapter 670 of the Florida Statutes," "to correctly, cautiously, and prudently process [the withdrawals] subject to commercially reasonable security procedures." The essence of the Trustee's negligence claim is that the Defendants failed to monitor the Debtors' bank accounts and discover Mr. Simpson's fraudulent activity.

Florida law does not impose an independent duty on banks, in the course of routine banking services, to monitor transactions made by authorized agents of the account holder

in order to protect the account holder against fraud or misappropriation.  *Lawrence*, 455 Fed. Appx. at 907 (citing *Emile*, 216 So. 2d at 446); *O'Halloran*, 350 F.3d at 1205.  A bank's responsibility extends only to confirming that the agent, at the time of the transaction, has the authority to make the transaction.  *O'Halloran*, 350 F.3d at 1205.  There is nothing in the Complaints that would lead the Court to question Mr. Simpson's authority to initiate the relevant transactions on behalf of the Debtors.

Likewise, Chapter 670 of the Florida Statutes, titled "Uniform Commercial Code— Fund Transfers," does not impose a general duty on banks to monitor customer accounts for fraud or misappropriation for the benefit of the customers themselves.  To the extent federal banking statutes and regulations, such as the Bank Secrecy Act, impose duties on banks, "those duties extend to the United States, not the bank's customers."  *Wiand*, 86 F. Supp. 3d at 1322.

In response to the Motions to Dismiss, the Trustee argues for the first time that a duty arose from the general facts of the case because the Defendants were allegedly aware of Mr. Simpson's fraudulent and suspicious activities.  As discussed above, "red flags" or mere suspicions are insufficient to trigger any obligation by the Defendant banks to investigate. *Lawrence*, 455 Fed. Appx. at 907; *Perlman*, 559 Fed. Appx. at 993-94.

Because the existence of a duty of care is essential to a claim for negligence and no duty is alleged here, count V of each of the Complaints fails as a matter of law and must be dismissed for that reason alone.

## DISMISSAL WITH PREJUDICE

The Trustee has not requested, by separate motion or otherwise, leave to amend the Complaints in the above-captioned adversary proceedings.  The Trustee has not filed a proposed amended complaint in any of the above-captioned adversary proceedings, containing additional allegations to further support the Trustee's claims against the

Defendants. The Court is not required to grant leave to amend *sua sponte*. *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) ("A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court."); *cf. Malivuk v. Ameripark, LLC*, 2017 U.S. App. LEXIS 10261, at *13 (11th Cir. 2017); *Perlman*, 561 Fed. Appx. at 814 (affirming a district court's denial of leave to amend where the plaintiff sought leave to amend in a footnote contained in his response to a motion to dismiss and did not indicate what additional facts the plaintiff intended to allege in a proposed amended complaint); *Perlman*, 559 Fed. Appx. at 996 n.10 (granting leave to amend where the plaintiff filed a specific motion before the district court requesting leave to amend, and filed a proposed second amended complaint setting out significant additional facts relating to the defendant's actual knowledge of an ongoing fraud). Accordingly, the Court will dismiss the Complaints with prejudice.

## ORDER

For the forgoing reasons, the Court ORDERS and ADJUDGES that the Motions to Dismiss [ECF No. 26, Adv. Proc. No. 16-01755-EPK; ECF No. 26, Adv. Proc. No. 16-01756-EPK; and ECF No. 21, Adv. Proc. No. 16-01757-EPK] are GRANTED and the Complaints [ECF No. 1, Adv. Proc. No. 16-01755-EPK; ECF No. 1, Adv. Proc. No. 16-01756-EPK; and ECF No. 1, Adv. Proc. No. 16-01757-EPK] are DISMISSED in their entirety with prejudice.

### 

Copies to all parties of record by the Clerk of Court.